LEO PHILLIPS V. THE STATE.

No. 20874.   Delivered May 8, 1940.
Rehearing Denied June 26, 1940.

The opinion states the case.

*Herbert G. Tigner* and *King C. Haynie,* (on appeal only) both of Houston, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is rape; the punishment, confinement in the penitentiary for life.

Winnie Fred Wilcox, the alleged injured party, testified, in substance, as follows: She was approximately 16 years of age at the time of the alleged offense. On the 3rd of August, 1938, Doris DeWall, Betty Lilley, Vernon Kulbeth, Fred Redding and appellant came to a point near her home in two Ford automobiles. She had not previously known Kulbeth, Redding or appellant, but was well acquainted with Doris DeWall. She had seen Betty Lilley around the school she attended but had never spoken to her. Doris DeWall introduced her to those she had not previously known. After this introduction she and Fred Redding entered one of the automobiles and drove away, following the car in which Doris DeWall, Betty Lilley, Vernon Kulbeth and appellant were riding. They proceeded to Magnolia Gardens, arriving there about 3:30 p. m. With the exception of prosecutrix, everybody ordered beer. She expressed

desire to drink a coca-cola but upon her companions becoming insistent, she ordered a bottle of beer. She drank only a few swallows, as beer always made her sick. Eventually some one ordered wine, and, with the exception of the prosecutrix, each member of the party drank the wine. After the wine had been finished Vernon Kulbeth and Doris DeWall went for a ride in appellant's car. After they had driven away, Fred Redding insulted prosecutrix. Upon learning that prosecutrix would not comply with his request, Redding made the same suggestion to Betty Lilley. Eventually Redding and Betty Lilley drove away in Redding's car, leaving appellant and prosecutrix alone. She and appellant discussed her school work, she stating to him that she was assistant librarian in the San Jacinto High School. After Redding and Betty Lilley returned with the car prosecutrix expressed the desire to go home, saying that her grandmother would be worried if she stayed too long. However, she said that she would like to see Doris DeWall before they left, as Doris had invited her to ride with appellant and the other parties. Thereupon she and appellant entered the car with Redding and Betty Lilley, she sitting in appellant's lap.

At this juncture we quote from the testimony of prosecutrix, as follows:

"We got in the car. Fred Redding was driving and Betty Lilley was sitting in the middle, and I was sitting in Leo Phillip's lap. It was just a coupe; that's the only thing I could do. So they turned off on a little road, You know, there's a highway, and then you go down a long dirt road to get to Magnolia Gardens—that's the way I remember it—and there's a way to turn off between the highway and Magnolia Gardens; there's a sort of little turn off in there. So I learned that Fred Redding and Betty Lilley had already been there, or knew where they (Doris and Vernon) were. Anyway, as we went down there, Fred drove too fast. There was a sort of curve, and their car was parked there. Well, he went too far around the curve, and we saw them, Vernon Kulbeth and Doris DeWall.

"Leo Phillips then started cursing Fred Redding, and told him he had gone too far, and that he knew better, and he would knock the hell out of him if he didn't get away from there. So he backed up pretty fast, and Leo Phillips kept calling him everything he could think of. * * * Leo Phillips hit Fred Redding, and Fred Redding didn't hit back. He hit him several times, and Fred just sat there. Leo sort of pushed me to the side and hit him several times, and told him to get out of the car, and he called him the same language that he had called

him previous to that, and so Fred got out of the car, and when he did, Betty slid out and ran, and when Leo got out, I slid out and ran. We each ran in a different direction. We thought the boys were fighting behind us, but they were both running after us. I started running to Doris and hollering 'Help!' She was the only one I knew to run to. I was about half way there—it was about a block, I think; I'm not quite sure—and it was very bumpy, uneven ground, and I didn't get quite half way to them when something hit me; it was Leo (appellant). We were both running, and I had on high heels and the ground was very uneven, and it seem to me that he hit me with the side of his hand; anyway, he pushed me over. Then he grabbed me up, because Fred had caught Betty and put her in the car. The car then left."

Again, prosecutrix testified, in substance, as follows: After Betty Lilley and Fred Redding drove away Doris DeWall and Vernon Kulbeth picked up the blanket upon which they had been lying, and entered the car. Appellant pushed prosecutrix in the car and "started after Fred Redding." Kulbeth was driving, but appellant had charge of the car. Driving at a high rate of speed, they endeavored to overtake Redding and Betty Lilley. Eventually appellant directed Kulbeth to turn off the highway, saying that he was "going to get what he came after." After the car stopped Kulbeth and Doris DeWall got out. Kulbeth placed a blanket on the ground directly behind the car. Prosecutrix walked toward the road where she met Frank McGee. Being uneasy in the situation in which she found herself, she told McGee she was in trouble and needed his help. She told him she wanted to go home. Observing a ranch house not far away, she asked McGee to let her ride his horse. He replied that the horse was wild and he did not believe she could ride it. When the last statement was made appellant was present. She then asked McGee to let her lead the horse, and he agreed. She, McGee and appellant were proceeding toward the ranch house, she leading the horse when appellant apparently observed the house and stated to her that he wanted her to get in the car. She replied that it was her desire to stay where she was. McGee also insisted that she be permitted to stay. An argument ensued, with the result that appellant ordered Kulbeth to get a gun and blow McGee's head off. At this juncture McGee left the scene and proceeded toward the ranch house.

Again, we quote from the testimony of prosecutrix as follows: "When the cowboy turned, I said I was going to stay

there until the sheriff came, and Leo hit me; he didn't just exactly hit me; he shoved me, shoved me down, and then he kicked me, and then he hit me sort of on the thigh or hip or something. It left a big black bruise for about two weeks; it was kind of high up, almost to my waist, but not quite.

"He then told me to get back in that car, 'get back in there damn quick,' and all the time he used terrible language, 'damn' and 'hell' and those words I told you a while ago. He used them all the time, and he called me a 'bitch' and 'whore' and a 'satchel'. I don't know what that means, but it didn't sound right. He just cursed right and left, and shoved me back in the car. He said he'd teach me to play around, * * * I was sort of sitting on his lap, sort of, not very much, and he started hitting me across the back of the head with both fists. He was so mad he could die, and he was just beating on me, just like that, right round in here, in the back of my head and my shoulders. I was not struck in the face, because I had it covered up like this, with my arms.

"Doris DeWall told him not to hit me, and so did Vernon, he said, 'Leo, cut it out; she has had enough of that.' He said something to that effect; I don't remember just what he did say. Both of them protested, but Vernon's was kind of half-hearted. Leo told him to shut his damn mouth; he would ask him when he wanted something, or wanted some advice."

Prosecutrix testified that after they left the pasture they drove down a road and stopped the car. Her feet were hurting her and she removed her shoes in order that she might run away in the event appellant sought to molest her. When appellant opened the door and procured a blanket she ran as fast as she could, but appellant overtook her and knocked her down. Again, we quote from the testimony of prosecutrix:

"That time he hit me; I don't know just how he did hit me. I was still sort of groggy from the other licks and was running as fast as I could, and just something hit me, and I know that time he knocked me down, and he sort of half way picked me up and about half way pushed and shoved me along. He said, 'Come on, you are going back this way; I have had all this damn foolishness I am going to take off of anybody,' 'off of any whore,' is what he said.

"Then he took me back. I don't quite remember much about that; I just remember getting there, and he just threw it down, the blanket or whatever it was, and next I went down. He caught me right here and shoved me down.

"I had on a two piece dress, sort of white linen crash; very

heavy material but its cool, but doesn't tear easily—a skirt and little jacket that comes up and buttons up at the bottom. He caught it right here and yanked it. He caught it at the front and yanked it open, and then he just sort of felt around.

"I had on a brassiere. It was not taken off of me. It was the kind that was very tight across the bottom, but was rather loose fitting across the front; it was just tied and will hold up with the straps, but was loose across the top. He felt around my breast. It was open down the front, and he grabbed hold of the skirt. Then he raised the waist to tear it off. Anyway, he pulled it all off, and then he held me down with one hand. I was still fighting, but it didn't do much good. I had on a sort of panty girdle effect, and he pulled that off; he yanked and unhooked that. He got some awful holds on my neck, and then yanked with the other. Every time I'd start to get up he'd push me back. He finally got it off and tossed it over to the side. And then, well, he did it.

"He put his hands right here on my shoulders like that, mashed them down, and used one knee, well, sort of separated mine, my knees, and then he did it. He put it in. I have heard what the private parts of a man are called since then, but I don't remember what they are. It was daylight. Yes sir, he had sexual intercourse with me at that time."

After leaving the place where appellant had assaulted the prosecutrix, the parties drove to a drink stand which was on the main highway. According to the testimony of prosecutrix, she left the car and entered the drink stand. However, appellant followed her and she only had the opportunity to say a few words to the woman who was in charge of the place. About the time she and appellant were re-entering the car she saw two men come around the side of the drink stand. She wanted to holler at them but appellant shoved her into the car and they drove away. According to her version, they traveled to an oil field, ?where the car was again stopped. While at the oil field appellant again forcibly ravished her. Touching this assault, she testified as follows:

"While we were there this defendant had another act of intercourse with me. That was not with my consent and permission. Besides an act of sexual intercourse something else happened with this defendant. Well, he got me by the back of the neck with a very awful hold, right across here, and, well, then he put it in my mouth. Yes, sir, he put his private parts in my mouth.

"That was at the oil field where he did that, the place he had

just previously had the sexual intercourse with me. I was about half way in and about half way out of the car at that time. That's when he knocked me down and I got the big bruise on my head. I hit my head against the steering wheel of the coupe.

"I don't know how long we stayed there; I don't remember much about it, but we couldn't have stayed there over an hour, I don't think.

"This defendant was mostly cursing; I don't remember much of what he said; I was just sort of dazed.

"At the time this defendant put it in my mouth, why, I objected, naturally, and he said that was the way he made his living. He said, I might just as well get used to that, because that's the way he made his living, like that. That was immediately after the act of intercourse that this defendant had with me. * * *

"While we were there at the oil field some cars passed us going out of that road, but we had to back out to let them out, or let them in. Leo Phillips had to do that; he was in the car then, driving. Leo Phillips and I then were in the car alone, and every time some one would want out they would stop far enough up there that he would have enough room to pull up, he'd back up, and he would drive with the left hand and put his other around the back of my neck or shoulder, and it was just hurting terribly, and he said if I hollered he'd kill me, and then he would back far enough down the road to let them by; it seems like nearly all of them went towards the highway, if I remember correctly.

"There was a car that came by there that had some men in it, and Doris DeWall screamed, and Vernon shoved her in the car, and they backed out as quick as they could and left."

After leaving the oil field, the parties drove to the home of Doris DeWall's mother, where prosecutrix and Doris left the car. Prosecutrix ran into the house and took down the receiver for the purpose of calling her uncle. She testified: "The first thing I did when I got inside was to call Mr. Jones, my uncle, and that's all I remember. I didn't hang the receiver up they told me later. The next thing I recall or have any knowledge about is I remember Uncle Buck coming, and two policemen with him, or sheriffs."

Prosecutrix was immediately removed to Jefferson Davis Hospital, where she was examined by physicians. One of the physicians testified that the hymen of prosecutrix showed a deep break; that the parts were discolored, swollen and bleed-

ing. Another physician testified that he found a tear in the hymen, and flecks of blood about the vulva. He said, "It was fairly fresh blood. Within a few hours at least." Further, it was his testimony that an analysis of a smear taken from the prosecutrix disclosed "a great many active male secretive cells, spermatozoa." In short, the testimony of the physician was to the effect that the hymen had been recently ruptured.

Appellant did not testify. However, he introduced parts of the testimony of prosecutrix taken on the habeas corpus hearing for the purpose of showing discrepancies between the testimony there given and that elicited upon the trial. He also introduced Doris DeWall, whose testimony was to the effect that there was nothing in the actions of prosecutrix during the time the parties were on the trip to Magnolia Gardens and the oil field to indicate to her that any force had been used on prosecutrix. It was her version that when prosecutrix and appellant returned to the car the clothing of prosecutrix was not disheveled and that there was no mud on her, notwithstanding the point at which they had stopped was muddy. Further, it was her version that prosecutrix at no time made outcry. This testimony contradicted the testimony of prosecutrix that she had screamed at the time she was assaulted. In short, the testimony of the witness tended to show that appellant had not had sexual relations with prosecutrix on the occasion in question.

Mrs. DeWall testified that prosecutrix's clothing was in good order when she came to her house, and called for her uncle.

In rebuttal, the state introduced a witness who testified that he saw prosecutrix after the alleged assault and that her clothing was rumpled and torn. He said: "Her dress was torn on the side." This witness also testified that when he entered the home of Mrs. DeWall, Doris DeWall and prosecutrix were pulling their hair and screaming, "I am ruined."

The state relied upon the transaction in the oil field, which was the second assault. In view of appellant's contention that the first act of intercourse rendered the prosecutrix unchaste and that the second act was with her consent, we have deemed it necessary to make the foregoing detailed statement of the testimony adduced upon the trial. If the first act of intercourse was with the consent of prosecutrix and not accomplished by force, appellant could not be properly convicted for the second act if prosecutrix consented to such act, notwith-

standing he himself committed the first act. Article 1183, P. C., reads as follows:

"Rape is the carnal knowledge of a woman without her consent obtained by force, threats or fraud; or the carnal knowledge of a woman other than the wife of the person having such carnal knowledge with or without consent and with or without the use of force, threats or fraud, such woman being so mentally diseased at the time as to have no will to oppose the act of carnal knowledge, the person having carnal knowledge of her knowing her to be so mentally diseased; or the carnal knowledge of a female under the age of eighteen years other than the wife of the person with or without her consent and with or without the use of force, threats or fraud; *provided that if she is fifteen years of age or over the defendant may show in consent cases she was not of previous chaste character as a defense.*" (Italics ours).

Under the italicised portion of the statute this court has held that one prior act of intercourse renders the female unchaste, notwithstanding the prior act was with the defendant. Norman v. State, 230 S. W. 991. However, if the prior act constituted rape by force, such prior act would not render the female unchaste. See Coots v. State, 7 S. W. (2d) 539. In 35 Texas Jurisprudence 848 it is said: "A conviction for rape by force is not sustainable unless the evidence shows beyond a reasonable doubt that the prosecutrix did not consent to the act of intercourse and that she put forth every exertion and means within her power to thwart the purpose of her assailant." We think the evidence we have hereinbefore set out was sufficient to warrant the conclusion of the jury that prosecutrix did not consent to the act of intercourse with appellant, and that she put forth every exertion and means within her power to prevent him from having sexual relations with her. It follows that we are constrained to overrule appellant's contention that the evidence shows that prosecutrix was not a chaste woman at the time appellant had the second act of sexual intercourse with her. We might add that we deem the evidence sufficient to show that the second act of intercourse was accomplished by the use of force.

Two counts were embraced in the indictment. In the first count the indictment charges the offense of rape on a female under the age of 18 years. In the second count rape by force, threats and fraud is alleged. Only the first count was submitted to the jury. It is appellant's contention that the count

last mentioned does not directly and affirmatively allege that Winnie Fred Wilcox, prosecutrix, was not the wife of the appellant. Omitting the formal parts, the first count reads as follows: "Leo Phillips * * * did have carnal knowledge of Winnie Fred Wilcox, a female then and there under the age of eighteen years, and then and there not being the wife of the said Leo Phillips." We are unable to agree with appellant that it is not affirmatively averred that prosecutrix was not the wife of the appellant. In looking to Section 1768 of Branch's Ann. Tex. P. C., we find that the form of indictment there set forth is substantially the same as that hereinabove quoted. Further discussion of the question is not deemed necessary.

Appellant excepted to the charge of the court for its failure to define the terms "force," "threats" and "fraud." The opinion is expressed that the exception was not well taken. The evidence, from the standpoint of the State, was definite that prosecutrix at the time of the alleged offense, was under the age of eighteen years, and that the appellant did, in fact, have carnal knowledge of her. It has already been observed that it was her version that the act of intercourse was without her consent. In short, according to her testimony, appellant used force in consummating the rape, which she was unable to prevent, notwithstanding she made the utmost resistance. Under the state's testimony, the appellant was guilty of rape, although he used no force, threats or fraud. Hence the court was not required to define such terms. NeSmith v. State, 246 S. W. 1038; Ulmer v. State, 160 S. W. 1188.

Bill of exception No. 1 presents the following occurrence: Appellant had been indicted as "Leo Phillips, alias Roberts." Upon it being shown that he had never gone by the name of Roberts, the court sustained appellant's motion and ordered that the alias be stricken from the indictment. Upon the voir dire examination of the prospective juror Saxon counsel for the state propounded to him the following question: "Do you know Leo Phillips, alias Roberts?" At the time this question was propounded the only juror who had been selected was sitting in the jury box less than ten feet away from the counsel for the state. Counsel for appellant immediately objected to the question, and the objection was sustained. Further, he requested the court to discharge the juror who had been selected. The court qualified the bill of exception as follows: "Schillo was the first juror chosen or accepted; was the only juror in the jury box, where he had remained after being accepted, without objection on the part of the state or defendant,

and there is nothing to indicate he heard or didn't hear said question. State's counsel never asked said question again, and the court admonished the juror chosen and the prospective juror Saxon not to consider said occurrence, if they heard it at all, and thereafter jurors, after chosen, were sent into the jury room. Mr. Peyton asking said question stated he didn't know said motion changing defendant's name to Leo Phillips without the alias had been granted and thereafter refrained from asking said question and Saxon was peremptorily challenged by the defendant without stating any reason to the court." In view of the qualification, which was not excepted to by appellant, to the effect that there was nothing to indicate that the juror Schillo had heard the question, we are of opinion that we would not be warranted in holding that the bill of exception reflects reversible error. It appears that it could have been easily determined whether the juror heard such question. It is to be presumed that if appellant's counsel had asked the court to make inquiry of the juror relative to the matter the request would have been complied with. At all events, we are not impressed with the view that if the juror heard the question he would have been disqualified. In short, we are unable to reach the conclusion that the mere suggestion that appellant might have assumed the name of Roberts was calculated to prejudice the juror against the appellant.

Bills of exception 2, 3, 7 and 8 relate to the same general subject matter and will therefore be treated together. According to the testimony of prosecutrix, immediately after appellant had ravished her he forced her to take his penis into her mouth, and stated to her "that she might just as well get used to that because that was the way he made his living." The court qualifies the bills of exception with the statement that the testimony was received as part of the res gestae. The opinion is expressed that the act and declaration in question were part of the res gestae of the rape. Such act and declaration and the offense for which appellant was upon trial were intermixed and blended with one another and so connected that they formed an indivisible transaction. The testimony in question was related to the transaction in that it was part of a detailed statement by the prosecutrix of the force appellant used upon her at the time he ravished her. Underhill on Criminal Evidence (3rd Ed.) Section 152, lays down the rule applicable here, as follows: "If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testi-

mony, whether direct or circumstantial, of any one of them cannot be made without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme."

See Claxton v. State, 4 S. W. (2d) 542.

In view of what we have said, it follows that we are constrained to hold that the bills of exception fails to reflect error.

Bill of exception No. 5, complains of the conduct of counsel for the state, and the court, with reference to proof of venue. It is contended by appellant that the bill shows that leading and suggestive questions were propounded by the court, as well as by counsel for the state, in seeking to have prosecutrix testify that the offense occurred in Harris County. It might be that some of the questions set forth in the bill of exception were leading. Be that as it may, it is observed that upon cross-examination by counsel for appellant prosecutrix testified positively that the assault upon her occurred in Harris County. We are unable to agree with appellant that the bill of exception reflects reversible error.

Bill of exception No. 10 is concerned with the argument of counsel for the state. We quote the remarks of counsel: "After he had completed that act she says he stuck his private parts in her mouth again." It is clear from the record that the argument was based upon testimony which had been properly received during the progress of the trial. Counsel had the right to comment upon the testimony that had gone before the jury under the rulings of the court.

As hereinbefore shown, the testimony for the state was to the effect that appellant ravished prosecutrix twice. It is shown in bill of exception No. 12 that in argument the district attorney referred to the details of the first transaction in the following language: "Didn't that arouse your manhood, your brotherhood and your fatherhood as true American Citizens?" Upon objection by appellant to the argument the jury were instructed to disregard it for any purpose. If it should be conceded that the remarks of counsel were improper—and this is not conceded—we would not feel warranted in holding that the argument was so obviously prejudicial that it could not be withdrawn from the jury by timely instruction.

Bill of exception 13 also relates to argument of counsel for the state. It is shown in such bill that counsel employed the

following language: "What you do (referring to the jury), that's your responsibility. We have put the facts up to you; you are men who say that you are men of courage, say that you can do it, and I submit to you gentlemen under the facts in this case, the defendant's testimony, 'that is how I make my living, you will have to learn to like it'—under that testimony, and if you believe it is the truth, you are bound under your oath to return a verdict of guilty, and assess the maximum penalty. I submit it to you." Appellant's counsel objected to the argument on the ground, among others, that it constituted a reference to the failure on the part of appellant to take the stand and testify. We are unable to perceive any reference in the remarks to the failure of the appellant to testify.

Bill of exception 14 is concerned with the remarks of counsel for the state in argument to the jury. As shown in the bill, counsel for the state referred to the mental anguish prosecutrix must have suffered in giving her testimony before a crowded courtroom. It is appellant's contention that the argument appealed to the prejudice, passion and sympathy of the jury. We find nothing in the remarks which we deem to have been improper.

The argument set forth in bill of exception 15 also was construed by counsel for appellant to constitute an appeal to prejudice. Among other things, counsel for the state said: "This little girl (prosecutrix) has to go through life as long as she lives with the thought of that man or beast * * *." The reference to appellant as "a beast" was no stronger than the language used in Borders v. State, 161 S. W. 483, in which it is shown that the prosecuting attorney pointed his finger at the accused and called him "a cold-blooded brute" and "an animal." In overruling the contention in that case that reversible error was presented, this court said: "While the prosecuting officer ought never to use epithets of any character, yet the killing, as shown by the evidence in this case, was done in rather a deliberate and brutal manner, and under such circumstances the language used would not present reversible error, and especially is this the case where no special charge was requested in regard thereto." Nor was the language employed by counsel in the instant case stronger than that used in argument in Frizzell v. State, 16 S. W. 752, in which a death penalty was assessed. There the district attorney referred to the accused as "a tramp, vagabond, and a villain." Presiding Judge White, in holding that the remarks did not present reversible error, said: "We are of opinion that no injury is shown by this bill

of exceptions. It is not shown that the remarks were such that under the circumstances they were calculated to illegally affect the defendant's rights." In Jackson v. State, 42 S. W. (2d) 433, in which a death penalty was assessed, it is shown that the prosecuting attorney referred to Jackson as "a beast, a black murderer." The argument was not approved by the court, but was held not to warrant a reversal of the judgment. In the present case, if the state's testimony was to be believed by the jury, appellant committed an atrocious crime. Having accepted the state's version of the transaction, it is not strange that the jury condemned appellant to confinement in the penitentiary for life. The conclusion is inescapable that the jury looked alone to the facts and circumstances in evidence in assessing the penalty. In determining if an improper argument is of such nature as to be obviously hurtful and prejudicial the facts and surroundings of the particular case must be looked to. We quote from opinion on motion for rehearing in Silver v. State, 8 S. W. (2d) 144, as follows: "Another thing that must be borne in mind is that the facts and surroundings of the particular case should be looked to in determining the effect of an argument complained of. The same language under a certain state of facts which might be highly prejudicial, and not so regarded under other circumstances." Giving application to the principles controlling, the opinion is expressed that the argument could not have prejudiced appellant's rights.

Bill of exception No. 23 relates to the action of the court in overruling appellant's motion for new trial in so far as it was based upon the alleged misconduct of the jury in referring to the failure of the appellant to testify. On hearing of the motion for new trial some of the jurors testified that during their deliberations reference was made to appellant's failure to testify. Others heard no such reference. One juror said that the matter was referred to but not discussed. We quote from the testimony of one of the jurors: "I said that such a statement was made relative to the failure of the defendant to testify, because I am positive it was made; the statement was made as a side remark to myself. There was no discussion of it generally; it was merely a statement which was immediately cut off." Another juror testified as follows: "It is not possible that there was some discussion about the defendant not having told his story. I would say definitely that there was no statement about that. It was not discussed absolutely and positively. Whether he took the stand or didn't was not discussed in the jury, or about his story being told." The opinion is expressed

that the conclusion was warranted that, if any reference was made to the failure of the appellant to testify, it constituted a mere casual mention, which was not followed by any discussion and was not considered by the jury as a circumstance against the appellant. See Day v. State, 48 S. W. (2d) 266. The evidence heard upon the motion for new trial is conflicting. Under the circumstances, the decision of the trial judge is conclusive upon this court unless from the record it is apparent that there was an abuse of discretion. This rule has prevailed since the beginning of our jurisprudence. In Day v. State, supra, we said: "The finding of the judge on conflicting evidence is analogous to the verdict of the jury upon the testimony. In each instance the result is binding on the court unless its unsoundness is demonstrated by the record." Again, we said: "The granting of a new trial for misconduct of the jury is largely in the discretion of the trial court, whose action in refusing a new trial will not be disturbed in the absence of an abuse of such discretion." We think the trial court was warranted in overruling the motion for new trial.

Appellant contends that the state failed to prove venue. We are unable to agree with this contention. It has already been observed from our discussion of bill of exception No. 5 that prosecutrix stated upon cross-examination by counsel for appellant that the assault upon her occurred in Harris County.

The last contention made by appellant is that the verdict is excessive. As heretofore stated, if the state's testimony was to be believed by the jury, appellant committed an atrocious crime. Having accepted the state's version of the transaction, the jury were, in our opinion, fully warranted in inflicting the penalty shown herein.

A careful examination of all of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

In his motion for rehearing appellant urges some of the same alleged errors which were considered and discussed in

our original opinion. Our views therein expressed remain unchanged, and we see nothing to be accomplished by writing further.

The motion for rehearing is overruled.